IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BILLY JOE WILLIAMS                                        PLAINTIFF

V.                        CIVIL NO. 5:08-CV-5238

MICHAEL J. ASTRUE,
Commissioner of Social Security                          DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Billy Joe Williams, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for disability and disability insurance benefits under Title II of the Social Security Act (the Act) and Supplemental Security Income under Title XVI of the Act.  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. §405(g).

## Procedural Background

Plaintiff protectively filed his application for a period of disability and disability insurance benefits on November 7, 2005.  (Tr. 54-56).  Plaintiff also protectively filed an application for Supplemental Social Security Income on November 7, 2005.  (Tr. 562-564).  The application alleged a disability onset date of December 31, 2000.  (Tr. 54).  The Social Security Administration denied the claim initially and upon reconsideration. (Tr. 33-34, 39-40, 570-572).  Pursuant to Plaintiff's request, a hearing was held on September 6, 2007, before Administrative Law Judge Edward M. Starr (ALJ), where Plaintiff and his mother, Peggy Fleming, appeared and testified.  (Tr. 574-596).  On November 28, 2007, the ALJ sent Floyd John Massey, a Vocational Expert (VE), a letter, asking

him to respond to the interrogatories included in the letter.  (Tr. 163).  The VE responded to the interrogatories (Tr. 164-167), and on December 21, 2007, the ALJ sent a letter to Plaintiff's counsel, enclosing a copy of the interrogatories completed by the VE.  (Tr. 168).  On June 27, 2008, the ALJ entered his decision denying Plaintiff's request for a determination of disability.  (Tr. 10-22). Plaintiff's request for a review of the hearing was denied by the Appeals Council on September 11, 2008.  (Tr. 5-8).

In his written decision, the ALJ found that Plaintiff had not been under a disability within the meaning of the Act from December 31, 2000, through the date of the decision.  (Tr. 13).  He further found that:

•   Plaintiff met the insured status requirements of the Act through March 31, 2007;

•   Plaintiff had the following severe impairment - disorder of the back and mood disorder;

•   Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1;

•   Plaintiff had the residual functional capacity (RFC) to occasionally lift/carry 20 pounds and frequently 10 pounds, could push/pull within these same limitations, could stand/walk 6 hours and can sit 6 hours, could not climb ladders or scaffolds and could not crawl, could not frequently climb stairs and ramps, balance, stoop, crouch, and kneel, could frequently grasp and finger bilaterally, had mild limitations in the activities of daily living, and moderate limitations in social functioning and concentration, persistence, and carrying out complex instructions, responding appropriately to usual work stresses and routine work changes, and interacting appropriately with supervisors, co-workers, and the public;

•   Plaintiff was unable to perform any past relevant work;

•   Plaintiff was born on July 23, 1956 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date;

•   Plaintiff had at least a high school education and was able to communicate in English.  (Tr. 16-22).

The ALJ considered  Plaintiff's age, education, work experience, and RFC, and concluded

there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, and Plaintiff had not been under a disability from December 31, 2000, through the date of the decision. (Tr. 22).

In his appeal of the ALJ's findings and conclusions, Plaintiff contends that substantial evidence does not support the ALJ's decision in that he failed to order a consultative examination, and that the ALJ erred by failing to evaluate all of Plaintiff's impairments. For the reasons stated below, the court remands this matter for further development of the record.

**Evidence Presented**

Plaintiff completed high school and thereafter went to computer school for three months. (Tr. 579). Plaintiff testified at the hearing that he broke his neck in 1989 and lived on pain pills and muscle relaxers heavily from 1989 to 2000, when he decided the medications were making him sick. (Tr. 580-581).[1]   As early as December of 2000, Plaintiff began presenting himself to medical facilities for lower back pain, chest pains, depression, bronchitis, and other ailments. (Tr. 171-175, 208-210, 211-216, 297, 300, 301, 302, 304, 306, 308, 310, 322).   For purposes of this review, although the court has thoroughly examined all of the medical records, it will limit the discussion to those records that are relevant to Plaintiff's allegations of disability. With respect to his back problems, records entered on July 24, 2005, and July 27, 2005, indicate Plaintiff had moderate osteoarthritis along the cervical spine with posterior osteophytes at C3,5,6 and 7 and intervertebral narrowing and disc degeneration at the C5-6,6-7 level. (Tr. 177-178). As of November 8, 2005, Plaintiff was observed as having difficulty with standing, walking and seeing, and walked with

---

[1]The court notes that in his decision, the ALJ inaccurately said that Plaintiff broke his neck in 1999 rather than 1989 and that he lived on pain pills from 1998 to 2000.

crutches, using them like a cane.  (Tr. 63).  Plaintiff also used a Tens unit (Tr. 102), which sometimes helped, but had to discontinue Flexerall because of the side effects.  (Tr. 105).  Plaintiff was noted to walk stiffly (Tr. 285) and had limited ability to reach all directions (Tr. 347).  At the hearing before the ALJ, Plaintiff stated that for the past two years, he could not get out of bed.  (Tr. 583).  On January 17, 2006, Dr. Alice Davidson's primary diagnosis was degenerative disc disease (Tr. 344), with limited ability to reach all directions (including overhead).

On September 9, 2004, Plaintiff went to Mercy Health System of Northwest Arkansas, Mercy Rogers Medical Center, with his chief complaint of feeling depressed and suicidal.  (Tr. 171).  Dr. Phillip W. Rhoads attempted to admit him to St. Mary's Hospital, but Plaintiff did not want to be admitted.  (Tr. 171).  Dr. Rhoads noted that Plaintiff was very calm throughout the entire interview but did discuss that for his safety and other people's safety, "we need to admit him to the hospital and plan on getting a psychiatric evaluation." (Tr. 171).  Dr. Rhoads also told Plaintiff that he would need to let the sheriff know if he left the clinic that day, and "he says the sheriffs already know." (Tr. 171).  Plaintiff told the doctor he had to go home and the doctor encouraged him to go to Ozark Guidance Center.  Plaintiff left the clinic and Dr. Rhoads notified the Benton County Sheriff's Office.  (Tr. 171).

On July 24, 2005, Plaintiff was injured in an altercation, injuring his face and head, and was brought on a stretcher to the Emergency Room of Eureka Springs Hospital.  (Tr. 177).[2]  A computed tomography of the facial bones indicated evidence of a fracture involving the right infraorbital region laterally.  (Tr. 179). Dr. Wayne E. Putnam, the examining physician, summarized as follows:

---

[2]The court notes that Plaintiff's subsequent medical visits began to increase after this altercation.

"Fracture, right maxillary sinus and zygomatic arch, nondisplaced.  No obvious evidence of entrapment involving the orbit is defined.  However, follow-up is recommended if symptomology is present with detailed computed tomography, axial and coronal images of the area of fracture if indicated clinically." (Tr. 179).  A CT of the brain taken on July 25, 2005, at the Washington Regional Medical Center revealed a normal head CT.  (Tr. 254).  At the same facility on July 25, 2005, a CT of the facial bones revealed "Multiple fractures involving the right orbital wall, the right maxillary antral wall and the zygomatic arch on the right." (Tr. 255).  On July 25, 2005, Plaintiff went to the Jeffries Eye Clinic, P.A. and the Impression/Diagnosis was "Contusion OD." (Tr. 181). On July 27, 2005, an exam of Plaintiff's skull and cervical spine by Dr. Putnam revealed no evidence of a fracture seen in the skull and moderate osteoarthritis was found along the cervical spine with posterior osteophytes at C3, 5, 6 and 7.  (Tr. 178).  Dr. Putnam also noted "Intervertebral narrowing and disc degeneration at the C5-6,6-7 level is demonstrated."  (Tr. 178).  Dr. Putnam gave a summary of Moderate osteoarthritis and no acute bony injury was identified.  (Tr. 178).

On August 11, 2005, when Plaintiff went to the Washington Regional Emergency Medical Center, complaining of chest pain  (Tr. 184),  he also complained of nonspecific upper abdominal pain.  (Tr. 184).  Dr. Stephen T. Wood's assessment was possible chronic cholecystitis with cholelithiasis.  Tr. 184).  Dr. John Oliver's assessment was chest pain, hypertension, anxiety, multiple facial fractures following trauma and Axis II disorder.  Dr. Oliver noted that Plaintiff "says he has occasional ethanol use, marijuana occasionally.  He says it relieves his shortness of breath and allergies.  He has been homeless since November of 2004."

On August 15, 2005, Plaintiff presented himself to Washington Regional Medical Center Emergency Room, complaining of dizziness and weakness. (Tr. 250).  The record of such visit notes

that the initial exam was completed and Plaintiff was poorly cooperative. (Tr. 252).  The doctor noted that Plaintiff informed staff he wanted to leave. (Tr. 252).  The final diagnosis was "recheck head contusion."  (Tr. 252).

On August 24, 2005, Plaintiff presented himself to the Washington Regional Medical Center Emergency Room with abdominal pain with diarrhea. (Tr. 218).  An Esophagogastroduodenoscopy was performed.  (Tr. 218).  He was discharged on August 25, 2005, and was advised to stay on his other medications and "start the one for depression and to return to the emergency room should he have any worsening of abdominal pain, vomiting, diarrhea, development of fever, chills, or any other thing he feels is way abnormal from his current symptoms."  (Tr. 220).

On December 26, 2005, the State of Arkansas sent a Second Request for medical records to Aneet Sharma, DDS (Tr. 259), and the response dated December 29, 2005, indicated: "Dr. Sharma aware of patients request for disabiltiy [sic] along with pt.'s allegations.  Dr. Sharma reviewed pt chart and CT and does not appreciate any deficets[sic] related to this said injury that occured [sic] on May 23, 2005 that should qualify him for disability and limit his working ability."   (Tr. 260). Dr. Sharma has spoken with Dr. Jefferies and both were in agreement that Plaintiff's facial fractures were not so severe as to cause a functional problem, but would be more for cosmetic concerns.  (Tr. 262).  Plaintiff was told that Dr. Sharma would be willing to do the surgery, but that it would be for cosmetic concerns and would possibly not be covered by the victims crime fund or insurance.  (Tr. 261).  When this information was passed along to Plaintiff, Plaintiff was very upset, "cursing and continued to repeat himself."  (Tr. 262).

Dr. Gene Chambers, a neuropsychologist, evaluated Plaintiff on January 12, 2006, and in his report (Mental Status and Evaluation of Adaptive Functioning), he stated that Plaintiff's alleged

impairments include back and neck problems, broken bones in his face, migraines, vertigo, fatigue, carpal tunnel syndrome, high blood pressure, depression and visual problems. (Tr. 281). It was further noted that Plaintiff's current medications were Vicodin, Darvocet and Flexeril. (Tr. 283). Plaintiff reported to Dr. Chambers that he smoked cigarettes occasionally and that he had not had anything to drink since July 23rd of 2005. He also told Dr. Chambers that he had not had any recreational drugs since July 23rd of 2005, and that he never abused recreational drugs, but would occasionally smoke pot. (Tr. 283). Dr. Chambers noted that Plaintiff was angry, somewhat hostile and very tearful. (Tr. 283). Dr. Chambers diagnosis was: AXIS I: Major Depression, recurrent; AXIS II: None identified; AXIS III: Deferred to physician's report; AXIS IV: Occupational problems, problems related to the social environment - the claimant states he doesn't want to see anyone or be around anyone.; AXIS V: gaf: 50. (Tr. 285).

Dr. Chambers further noted that there was no evidence of unusual passivity, dependency, aggression, impulsiveness or withdrawn behavior, that Plaintiff walked stiffly and that his neck appeared to be rather stiff and like he did not have free movement of it. Plaintiff also kept his right eye permanently closed throughout the procedure and stated that bright lights hurt the eye. (Tr. 285). Dr. Chambers believed Plaintiff was open and honest and that there was no evidence of exaggeration or malingering. (Tr. 286). Approximately three months later, on March, 1, 2006, Dr. Chambers completed a Physical Exertions Limitations Form, wherein he checked the box that indicates Plaintiff could perform "NO WORK AT ALL (because less than ten (10) pounds lift/carry and less than eight (8) hours per day total combined sit/stand/walk in a work environment)." (Tr. 280). A Mental RFC Assessment form was not completed by Dr. Chambers.

On January 17, 2006, a Physical Residual Functional Capacity Assessment by Dr. Alice

Davidson was completed. (Tr. 344-351). The primary diagnosis was degenerative disc disease. (Tr. 344). Dr. Davidson concluded that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, push and/or pull unlimited, other than as shown for lift and/or carry. (Tr. 345). No postural, visual, communicative or environmental limitations were established and it was found that Plaintiff had a limited ability to reach all directions. (Tr. 346-348).

On January 30, 2006, a Psychiatric Review Technique form, completed by Dr. Kay Gale, concluded that Plaintiff had no mental health treatment and "[o]n exam, shows evidence of major depression and a pain disorder with both psychological and medical factors."... "Overall information does not document marked and severe functional limitation due to mental illness." (Tr. 278). A Mental Residual Functional Capacity Assessment was also completed by Dr. Gale on January 30, 2006, (Tr. 335-338) in which she concluded that Plaintiff had: moderately limited ability to understand and remember detailed instruction; moderately limited ability to carry out detailed instructions and the ability to maintain attention and concentration for extended periods; moderately limited ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; moderately limited ability to interact appropriately with the general public and in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 335-336). On February 1, 2006, Dr. Gale prepared a Disability Determination and Transmittal, wherein she opined the primary diagnosis was disorder of the back and the secondary diagnosis was mood disorders. (Tr. 34). Dr. Gale concluded that

-8-

Plaintiff was not disabled through the date of the current determination.  (Tr. 34).

Subsequent to Dr. Gale's report, Plaintiff completed a "Disability Report - Appeal" on February 14, 2006, which indicated that since Plaintiff had last completed a disability report, he began suffering from migraines, his depression had increased to the "point of insanity" and that he began grinding his teeth because he was "constantly dwelling on problems."  (Tr. 106).  The report further indicated that Plaintiff could not interact in public, and that he had "intense anger & rage at all around."  (Tr. 110).

On February 17, 2006, a diagnostic interview was conducted at Ozark Guidance Center by David E. Montgomery, L.P.C. (Licensed Professional Counselor) (Tr. 320-321, 511-512 and 540-541).  Mr. Montgomery stated that through most of the session, client had one eye closed, but at the end of the session, he had both eyes open for a short while. (Tr. 320).  Mr. Montgomery found that his affect was very flat and that Plaintiff was averse to exploring possible solutions.  (Tr. 320).

On March 11, 2006, Plaintiff presented himself to St. Mary's Hospital Emergency Room, complaining of suicidal thoughts and depression.  (Tr. 425-427).  On March 12, 2006, Dr. K. Lamar Howard prepared a History and Physical Report (Tr. 291, 422-424), stating that Plaintiff presented to the emergency room "last night with a very vague presentation but vaguely suicidal and also mentioning potential harm to others." (Tr. 291).  Dr. Howard further found that Plaintiff  "speaks indirectly of suicide and also of harming the girlfriend and other people that have caused him misery but more so just from a hypothetical standpoint by my judgment." (Tr. 291).  Dr. Howard found that Plaintiff appeared rational and did not think Plaintiff had any delusions or any apparent psychosis.  (Tr. 292).  Dr. Howard found Plaintiff to be well dressed, well groomed, very verbose, and somewhat grandiose and tearful at times.  "A little on the dramatic side."  (Tr. 292).  Dr. Howard's Diagnosis

-9-

was "Depression" and agitation.  (Tr. 293).  Although Dr. Howard found Plaintiff to be rather hard to figure, he also stated "that he has some behaviors and speech that suggest to me that he may be hyomanic and could have bipolar disorder and/or a personality disorder."  (Tr. 293).  Dr. Howard stated that Ozark Guidance had interviewed him "and expressed concerns that we should not send him home and their notes are on the chart.  Their picture over the phone was a little different than mine but I will defer certainly to their expertise."  (Tr. 293).  The St. Mary's Hospital Discharge Summary Report dated March 13, 2006, stated that "The patient was evaluated by Ozark Guidance Center who determined that he was not actively suicidal" and reflected the Final Diagnosis as suicidal ideation.  (Tr. 290).  The report further stated: "The patient was evaluated by Ozark Guidance Center who determined that he was not actively suicidal.  They did secure a no-harm contract with him.  They made arrangements for him to go to the Crisis Stabilization Unit that very day upon leaving here.  This was accomplished." (Tr. 290).

On March 14, 2006, Plaintiff re-presented himself to St. Mary's Hospital Emergency Room, with his chief complaint being depression.  (Tr. 294).  The record reflects that the Clinical Impression was "Psychosis" by Dr. Scott Lafferty.   In the St. Mary's Hospital Discharge Summary Report, it is noted by Dr. R.W. Donnell as follows: "Just within a day after having been discharged from here, the patient re-presented to the emergency room with suicidal ideation. ...We had Ozark Guidance Center see him again.  They did a face-to-face assessment.  They once again said that he was not actively suicidal." (Tr. 288).   Dr. Donnell continues: "Our suicide precautions specify that the patient be under direct visualization by the personnel at all times.  Nevertheless, as I was later informed, he eloped.  The departure was therefore AMA.  Discharge was not in effect because the above conditions had not been met."  (Tr. 288).

A Mental Residual Functional Capacity Assessment was completed on April 10, 2006, by David P. Montgomery, L.P.C. from the Ozark Guidance Center. (Tr. 316-318). Mr. Montgomery found, inter alia, that Plaintiff had no ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; no ability to travel in unfamiliar places or use public transportation; no ability to maintain personal appearance, and a marked ability to behave in an emotionally stable manner. (Tr. 317). In an individual therapy report dated April 12, 2006, Mr. Montgomery described Plaintiff in part: depressed mood, neat and clean appearance; restricted affect; mood-pessimistic and dramatic and thought content - obsessive. (Tr. 315). He also found Plaintiff to be non- homicidal/suicidal ideation and that he continued to need mental health services. (Tr. 315). Mr. Montgomery subsequently noted that Plaintiff lost contact with them. (Tr. 312-313, 590-510 and 542-543).

On June 15, 2006, Plaintiff presented himself to the St. Mary's Emergency Room, complaining of shortness of breath. (Tr. 482). In the triage assessment sheet, it is noted that Plaintiff felt as if he could not get a deep breath and "passed out" at triage. (Tr. 484). He was also noted to be suicidal and depressed. (Tr. 484). A single chest view x-ray was taken and the impression was negative. (Tr. 485).

On September 13, 2006, Dr. Randy Duane Conover completed a Disability Determination for Social Security Administration, wherein he found no evidence of psychosis or serious mood disorder. (Tr. 328).

On September 20, 2006, a Mental Status & Evaluation of Adaptive Functioning was completed by Jeanne H. Curtis, Psy.D. (Tr. 330-334). Dr. Curtis noted that Plaintiff talked almost continually for about one hour. (Tr. 330). She further found that the amount of information Plaintiff

gave exceeded her ability to record it all, and he was blaming of others for all of his problems.  (Tr. 331).  She further stated: "Mr. Williams stated that he had smoked marijuana recreationally but never had a problem with substance use.  A collateral source, a family member, with whom Mr. Williams gave the examiner permission to speak, stated that Mr. Williams had drug and alcohol problems for many years and had been in rehabilitation many times but did not have specific details."  (Tr. 331).  She found Plaintiff to be "mostly hostile, yet relaxed, during the interview."  (Tr. 332).  She also noted that the collateral source reported that Plaintiff had been psychotic in the past and that it may have been drug related.  (Tr. 332).  She stated that Plaintiff often felt "ready to slit my wrist."  (Tr. 332).  Dr. Curtis' diagnoses was: Axis I: Bipolar I Disorder, Most Recent Episode Mixed; Axis II: Narcissistic Personality Disorder; Borderline Personality Disorder; Axis III: Deferred; Axis IV: Problems with primary support group, Occupational problems, Economic problems, Problems with access to health care services; and Axis V: GAF: 50 (current).  Her prognosis was: Guarded, with appropriate intervention.  (Tr. 333).  She found that there was no evidence of unusual passivity, dependency, aggression, impulsiveness or withdrawal and that he exhibited no physical problems or limitations that were personally observed that would interfere with his adaptive functioning.  (Tr. 334).  Dr. Curtis concluded that Plaintiff appeared to possibly be exaggerating both his symptoms and history during the interview, and, "according to a collateral source who was a family member, was not honest about some issues, such as his substance use and psychotic experiences."  (Tr. 334).

From September of 2006 to May 13, 2007, Plaintiff presented himself to emergency rooms, with various complaints - earache, back pain, abdominal pain, chronic back pain/black stools and skin rash.  Additionally, Plaintiff visited the Ozark Guidance Center on various occasions in 2007.

In a report prepared by Barbara Wise-Doyle, L.P.C., from the Ozark Guidance Center - Crisis

Intervention, on March 14, 2006, she indicates that Plaintiff was upset about the "no meds here today and it is questionable he will return.  He was given the information about the free clinics and homeless shelters neither of which he was interested in." (Tr. 319).  On March 26, 2007, Ms. Wise-Doyle stated that Plaintiff appeared to be on drugs although he denied he uses them.  (Tr. 501)(noting that on a previous visit last year at this time he was positive for drugs).  She stated that Plaintiff's stories "do not add up and they kept changing." (Tr. 501).  "Life is an every day struggle to continue to want to live he stated and it has been this suicidal since 1981 and does not see that changing." (Tr. 501).  Ms. Wise-Doyle stated that Plaintiff did not want counseling or any medications and did not want to see a MD and that he was rude and angry with the front office.  (Tr. 501).

On April 4 and April 23, 2007, Plaintiff presented himself to Dr. Kay Morgan, of  the Tree of Life, in Rogers, Arkansas.  In her Progress Records, Dr. Morgan stated that Plaintiff came to her with "multiple complaints," stating that he was "having a nervous breakdown today." (Tr. 440).  She noted that he refused to go to OGC, refused antidepressants, stating that he had taken all of them in the past and that he was afraid they may worsen his stomach.  "I don't want to be a guinea pig for some pharmaceutical company." (Tr. 440).  With regard to his mental status, Dr. Morgan found him to be "oriented, angry, tearful-depression/anxiety; disability hearing pending." (Tr. 440).

A Social Security Disability Medical Source Statement - Physical and general worksheet were prepared by Dr. Janelle Potts, a family practitioner, on May 14, 2007.  (Tr. 513-516 and 538).  In the worksheet, Dr. Potts noted that Plaintiff wanted papers filled out and was "threatening suicide." (Tr. 513).  She found that Plaintiff had "severe depression" and concluded that based upon the problems presented and her observations of his behavior, "I  feel there's no way he could hold a job." (Tr. 513).  In a Mental RFC Assessment dated May 14, 2007, Dr. Potts checked all of the

abilities listed as either poor ability or markedly limited.  (Tr. 517).  In her Physical RFC

Assessment, Abbreviated, Dr. Potts checked all of the statements as applying to Plaintiff:

•       Can not sit for six hours of an eight hour work-day.

•       Can not sit/stand/walk in combination for eight hours in an eight hour work-day.

•       Can not perform part-time work activities of any nature for more than ten hours in a forty
        hour work-week.

•       Requires four or more unscheduled work breaks in an eight hour work-day due to physical
        restrictions.

•       Has significant limitations in the ability to reach/push/pull bilaterally in the upper
        extremities.

•       Has significant limitations in the ability to handle and work with small objects with both
        hands.  (Tr. 519).

Finally, in her Physical Exertions Limitations Form, Dr. Potts found Plaintiff was capable of "NO

WORK AT ALL."  (Tr. 521).

        On June 19, 2007, clinician Debra Bauer of the Ozark Guidance Center met with Plaintiff,

when she explained to Plaintiff that the clinic would not be helping him get on disability.  (Tr. 495).

She stated that Plaintiff appeared very angry during the entire session, and that when she offered him

resource guides to link him with resources in the community, he declined, stating that he smokes pot,

but denied any other drug use.  (Tr. 495).  When asked what he wanted to get out of therapy for

himself, Plaintiff stated, "I want to get on disability."  (Tr. 495).  He reported that if he does not get

disability at his hearing he was going to kill himself.  (Tr. 496).  He stated that he was "very angry"

and when Ms. Bauer advised that they could work on anger issues in therapy, offering him a handout

on anger management, Plaintiff refused to look at the handout or take it and stated "I smoke pot to

manage my anger."  (Tr. 496).  Ms. Bauer found Plaintiff to be irritable, oppositional, hostile and

-14-

immature.  (Tr. 497).

At the conclusion of the hearing before the ALJ, the ALJ noted that he wished Dr. Chambers had used a mental RFC form instead of a physical RFC form (Tr. 594).  The ALJ further stated: "I'm looking for a way to grant this case without having to do a CE, because I think I know what a CE is going to show, and there's no point in putting him through that.  I'm not so sure at this point that I'm willing to take this back to the alleged onset date of December of 2000."  (Tr. 594-595).  The ALJ concluded the hearing by telling Plaintiff's attorney to "get me the material I think I need to grant the case, I'll do it without the necessity of going through a CE with an amendment of July of '05...."Because I think this guy needs some help, I really do."  (Tr. 595).

**Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

-15-

It is also well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3), 1382(3)(D).  A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits; (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his residual functional capacity (RFC).  See McCoy v. Schwieker, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

Additionally, the ALJ has a duty to fully and fairly develop the record.  It is incumbent upon the ALJ to establish by medical evidence that the claimant has the requisite RFC and to question a claimant in detail about his abilities.  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," Roberts v. Apfel,

222 F.3d 466, 469 (8th Cir.2000), we have also stated that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir.2001). The record should "include some medical evidence that supports the ALJ's residual functional capacity finding."   Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam).  The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.2000). In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional. See 20 C.F.R. § 404.1545(c); cf. Ford v. Secretary of Health and Human Services, 662 F.Supp. 954, 955-956 (W.D.Ark.1987) (RFC was "medical question," and medical evidence was required to establish how claimant's heart attacks affected his RFC)(cited with approval in Nevland, 204 F.3d at 858); Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003).  The ALJ's duty is to determine a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations.  Eichelberger v. Barnhart, 390 F. 3d 584, 591 (8th Cir. 2004); Guilliams v. Barnhart, 393 F. 3d 798, 801 (8th Cir. 2005).

**Discussion**

The ALJ found Plaintiff had the following severe impairments: disorder of the back and mood disorder.  (Tr. 15).  He further concluded that Plaintiff's back disorder and any related limitations "are not severe to a degree that would limit activities beyond the scope of the residual functional capacity as determined in this decision." (Tr. 17).   The ALJ also found that Plaintiff's mental impairment had resulted in mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration,

persistence, or pace, and that he had experienced no episodes of decompensation of extended duration.  (Tr. 19).  The ALJ took note of the mental RFC assessment completed by Daniel Montgomery as unreliable and that the physical and mental medical source statements completed by Dr. Janelle Potts were inconsistent and too extreme to be credible.  (Tr. 20).  Plaintiff asserts that the ALJ did not base his determination on all of the relevant evidence in the record in determining Plaintiff's RFC and that the ALJ based his findings on two one-time examinations conducted by non-treating physicians.

The court finds that this matter should be remanded in order for the ALJ to ask Dr. Chambers, a neuropsychologist, and Dr. Curtis, a psychiatrist, to complete a Mental RFC Assessment and also to obtain a consultation examination, in order to more clearly determine Plaintiff's RFC.  There is a considerable amount of evidence indicating Plaintiff has a mental impairment.  Whether it is of such severity, combined with his other impairments, so as to not allow Plaintiff to be able to work and function in a normal society requires further evaluation by mental health experts. The ALJ himself obviously struggled at the hearing with the issues relating to Plaintiff's mental condition.  The Court also notes that when the ALJ presented the VE with a second hypothetical, asking the VE to assume Plaintiff had a reduced ability to understand, remember and carry out simple instructions to a marked limitation (a serious limitation which represents a substantial loss of ability), the VE stated that such individual could not perform any work in national or state economy on a sustained basis.  It is therefore critical to the determination of Plaintiff's disability that the ALJ obtain opinions regarding Plaintiff's RFC from mental health specialists as well as request a consultative exam.

Based upon the foregoing, and after reviewing the entire evidence of record, we find remand

is necessary in order for the ALJ to more fully and fairly develop the record with regard to Plaintiff's RFC, by asking Dr. Chambers, a neuropsychologist, and Dr. Curtis, a psychiatrist, to complete a Mental RFC Assessment and also to obtain a consultation examination. With this evidence, the ALJ should then re-evaluate Plaintiff's RFC and specifically list in a hypothetical to a vocational expert any limitations that are indicated in the RFC assessments and supported by the evidence.

**Conclusion:**

Based on the foregoing, the undersigned reverses the decision of the ALJ and remands this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. §405(g). DATED this 16th day of November, 2009.

/s/ Erin L. Setser
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE